**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FEDERAL INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 C 1174 |
| | ) | |
| ARTHUR ANDERSEN LLP, ANDERSEN | ) | |
| WORLDWIDE, S.C., and LARRY J. GORRELL, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Federal Insurance Company ("Federal") brought a twenty-six count complaint seeking declaratory judgment that Federal has neither a duty to defend nor a duty to indemnify its insureds – Arthur Andersen LLP ("Andersen"), Andersen Worldwide, S.C. ("Worldwide"), and Larry J. Gorrell ("Gorrell") – in connection with disputes arising from Andersen's refusal to disburse retired partners' benefits in lump-sum payments. In response, Andersen and Gorrell (collectively the "Insureds" or the "Defendants")[1] counterclaimed seeking: (1) a declaratory judgment that Federal breached its duty to defend and that, as a result, Federal is estopped from denying coverage in this case; (2) monetary damages to compensate Andersen for Federal's breach of duty; and (3) statutory damages for Federal's "vexatious and unreasonable" conduct as provided in Section 155 of the Illinois Insurance Code. Currently before the Court are the following summary judgment motions: (1) the Defendants' motion for partial summary

---

[1]     Worldwide is not a party to the Insureds' motions for summary judgment.

judgment on their estoppel counterclaim; (2) Federal's motion for summary judgment on each of the Defendants' counterclaims, and (3) the Defendants' cross-motion for summary judgment on their second and third counterclaims. (R. 123-1, Pl.'s and Defs.' Renewed Mots. for Summ. J.) For the reasons below, the Court denies each motion.

## BACKGROUND

### I. The Parties

Federal is a corporation organized under the laws of the State of Indiana with its principal place of business in New Jersey. (R. 137-1, Pl.'s Stmt. of Mat. Facts in Supp. of Its Mot. for Summ. J. ("Pl.'s SMF") at ¶ 1.) Defendant Arthur Andersen LLP is an Illinois limited liability partnership with its principal place of business in Chicago, Illinois. (*Id.* at ¶ 2.) Currently, Arthur Andersen LLP has four partners, each of whom is a citizen of the State of Illinois. (*Id.* at ¶ 3.) Worldwide is a Societe Cooperative formed under the laws of the Swiss Confederation. (R. 135-1, Pl.'s Stmt. of Add. Mat. Facts in Opp. to Defs.' Mot. for Partial Summ. J. ("Pl.'s SAMF"), Ex. 3 at AA 0605.) Until August 2002, Mr. Gorrell was a partner at Andersen, and he currently resides in North Carolina. (R. 137-1, Pl.'s SMF at ¶ 4.)

### II. The Policy

Federal issued an Executive Protection Policy (the "Policy"), including "Fiduciary Liability Coverage," to Worldwide for a policy period from January 1, 2000 to January 1, 2003.[2] (*Id.* at ¶ 7.) The Insuring Clause defines the scope of the Policy's coverage:

> [Federal] shall pay on behalf of each of the Insureds all Loss for which the Insured becomes legally obligated to pay on account of any Claim first made

---

[2] The parties agree that Andersen, Worldwide, and Gorrell are "Insureds" as defined by the Policy.

against the Insured during the Policy Period . . . for a Wrongful Act committed, attempted, or allegedly committed or attempted, before or during the Policy Period by an Insured or by a person for whose Wrongful Acts the Insured is legally responsible.

(Pl.'s Third Am. Compl., Ex. A at ¶ 1.)  The Policy further defines certain key terms used in the Insuring Clause:

- "'Loss' means the total amount which any Insured(s) becomes legally obligated to pay on account of each Claim and for all Claims in each Policy Period . . . made against them for Wrongful Acts for which coverage applies, including, but not limited to, damages, judgments, settlements, costs and Defense Costs.  Loss does not include matters uninsurable under the law pursuant to which this coverage section is construed."

- "'Claim' means (a) a written demand for monetary damages, (b) a civil proceeding commenced by the service of a complaint or similar pleading, (c) a criminal proceeding commenced by a return of an indictment, or (d) a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, for investigative order or similar document."

- "[W]ith respect to a Sponsored Plan," "Wrongful Act" means: "(i) any breach of responsibilities, obligations or duties imposed upon fiduciaries of the Sponsored Plan by [ERISA] or by the common or statutory law of the United States . . . (ii) any other matter claimed against the Sponsor Organization or an Insured Person solely because of the Sponsor Organization's or the Insured Person's service as a fiduciary of any Sponsored Plan; or (iii) any negligent act, error or omission in the Administration of any Sponsored Plan . . ."

- "'Sponsored Plan' means:  (a) an Employee Benefit Plan [*i.e.* any plan so defined under ERISA] which is operated solely by the Sponsor Organization [*i.e.* Worldwide and Andersen] . . . for the benefit of the employees of the Sponsor Organization . . . (b) any other plan, fund, or program specifically included as a Sponsored Plan and named in Item 5 of the Declarations for this coverage section[3]; provided, however, Sponsored Plan shall not include any multiemployer plan, as defined in [ERISA]; or (c) any other employee benefit plan or program not subject to Title 1 of [ERISA], sponsored solely by the Sponsor Organization for the benefit of the employees of the Sponsor Organization."

---

[3]     Item 5 identifies "[a]ny 'Benefit Programs' sponsored, operated, maintained, or administered by the 'Sponsor Organization' for the benefit of the employees of the 'Sponsor Organization' located anywhere in the world . . ."  (*Id.*, Ex. A at 1.)

(*Id.*, Ex. A at ¶ 15.)  Inserting these definitions into the Insuring Clause as is relevant here, Federal must cover the total amount (including settlements and Defense Costs) that Andersen or Gorrell become legally obligated to pay as a result of a written demand or a civil proceeding against them for negligence in administering employee benefits or breach of their fiduciary duties under ERISA.  Prior to triggering indemnification, however, the Policy requires the Insureds to cooperate with any Federal claim investigation and also to obtain Federal's consent before settling any Claim.[4]  (*Id.*, Ex. A at ¶ 3; Pl.'s SMF at ¶ 16.)

In addition, the Policy carves out from coverage any Loss (other than Defense Costs) that "constitutes benefits due or to become due under the terms of a Benefit Program," meaning "any Sponsored Plan."[5]  (*Id.*, Ex. A at ¶¶ 6(d), 15.)  The "benefits due" exclusion contains an exception, however:  the Policy will cover "benefits due" "to the extent that, (i) the Insured is a natural person and the benefits are payable by such Insured as a personal obligation, and (ii) recovery for the benefits is based upon a covered Wrongful Act."  (*Id.*, Ex. A at ¶ 6(d).)

---

[4]      Specifically, the Policy contains a "Defense Provision[]" obligating its Insureds "to provide [Federal] with all information, assistance and cooperation which [Federal] reasonably requests and agree that in the event of a Claim the Insureds will do nothing that may prejudice [Federal's] position or actual rights of recovery.  The Insureds [also] agree not to settle any Claim or incur any Defense Costs in an amount greater than $250,000, assume any contractual obligation or admit any liability with respect to any Claim without the [Federal's] written consent, which shall not be unreasonably withheld.  [Federal] shall not be liable for any settlement and/or Defense Costs above $250,000, assumed obligation or admission to which it has not consented."  (*Id.*, Ex. A at ¶ 3.)

[5]      Also included, in the definition of "Benefit Program," but not relevant here, are "Insured Plan[s]," meaning "any government-mandated insurance program for workers' compensation, unemployment, social security or disability benefits for employees of [Andersen and Worldwide]."  (*Id.,* Ex. A at ¶ 15.)

## III.    The Underlying Claims

On March 22, 2002, in the face of Andersen's well-publicized difficulties following

Enron's collapse, ten of Andersen's retired partners filed a putative class action[6] against

Andersen seeking a prompt, lump sum distribution of their retirement benefits under the

Andersen Partnership Agreement (the "Partnership Agreement").  (R. 135-1, Pl.'s SAMF, Ex. 3

(attaching the complaint in *Buchholz, et al. v. Arthur Andersen, LLP, et al*, No. 02 C 2125 and

the amended complaint in the same matter, restyled as *Bryce, et al. v. Arthur Andersen, LLP, et*

*al.*).)[7]  The Partnership Agreement allegedly entitled the Class Plaintiffs to certain guaranteed

benefits (then at risk because Andersen funded the retirement plans from its then-current assets

and revenue) including:

> (1) a basic retirement benefit (paid for by each Andersen Retiree through payroll
> deductions over the course of his or her career) paid monthly, of a fixed amount, over the
> remainder of his/her lifetime.
>
> (2) payment of each Andersen Retiree's pro forma capital balance, payable in either a
> lump sum upon demand or over a period of years; [and]
>
> (3) payment of an early retirement benefit (available in a lump sum payment or in
> installment payments over ten years) to provide for the payment of a percentage of
> earnings to eligible participants from the early retirement date to the mandatory
> retirement date.

(*Id.*, Ex. 7 at FED 01140, 01143-56, 01214, 01219-23.)  The *Buchholz/Bryce* plaintiffs

demanded recovery under a variety of legal theories, including breach of the Partnership

---

[6]     The proposed class definition included "all retired 'partners' of Andersen."  (*Id.*,
Ex. at ¶ 9.)

[7]     The *Bryce* complaint asserted the same theories of recovery but, unlike *Buchholz*,
*Bryce* further sought a declaratory judgment that the issues raised in the complaint were subject
to an arbitration provision in the Partnership Agreement.  (R. 135-1, Pl.'s SAMF, Ex. 7.)

Agreement and breach of ERISA's fiduciary requirements[8] – the latter claim resting, in part, on

the fact that, as an informal practice, Andersen typically permitted retiring partners to receive

retirement benefits in lump sums, if they so requested. (*Id.*, Ex. 3 at AA 0625-41; R. 129-1,

Defs.' Resp. to Pl.'s SAMF, Ex. 29 at FED 03657.)

## IV. Communications Between Federal and Andersen

On May 16, 2002, Andrea Lieberman, in-house counsel for Andersen's insurance broker,

Marsh USA Inc. ("Marsh"),[9] wrote Federal[10] to provide notice of the *Buchholz* and *Bryce*

complaints. (R. 135-1, Pl.'s SAMF at ¶ 1.) Ms. Lieberman asked Federal to confirm coverage

and to consent to Andersen's choice of counsel:

> Pursuant to the [Policy's] Notice Provision . . . please find enclosed a complaint filed
> against your Insured . . . on or about March 22, 2002, styled <u>David Buchholz, et al. v.</u>

---

[8] The *Bryce* plaintiffs alleged that, although denominated "partners," each of the retired partners was substantively an "employee" for ERISA purposes and that, as a result, the retirement benefits described in the Partnership Agreement constituted employee benefit plans within the meaning of ERISA. (*Id.*, Ex. 3 at AA 0625-27.) In support of this argument, the *Bryce* complaint alleges that the retired partners were "employees" because, among other things, each of them: (1) had other partners supervise their work, (2) lacked the authority to make staffing decisions on their projects, (3) lacked authority to accept new clients on behalf of the firm, (4) lacked authority to enter into binding agreements or contracts on behalf of Andersen, (5) did not have a role in firm management, (6) owned only a nominal amount of equity, and (7) was not allowed to participate in making decisions about company organization or promoting/appointing persons to managerial positions or changes to the managerial organization. (*Id.*, Ex. 3 at AA 0625-27.)

[9] The parties agree that Marsh acted as Andersen's insurance broker, but Andersen further points out that Marsh and Federal had entered into a "Placement Service Agreement" whereby Marsh would receive, in addition to commission payments, a fee (roughly 18% of new premiums) for obtaining Fiduciary Liability coverage for companies such as Andersen. (R. 129-1, Defs.' Resp. to Pl.'s SAMF at ¶ 1, Ex. 31.)

[10] Ms. Lieberman actually directed her letter to Mr. Kim Hogrefe of the Chubb Group of Insurance Companies, which, apparently, is affiliated of Federal Insurance Company. (R. 135-1, Pl.'s SAMF, Ex. 3.) Both the letter and the parties treat Chubb as if it and Federal are one and the same and, accordingly, so will the Court.

Arthur Andersen LLP and Andersen Worldwide.  We also enclose an amended complaint filed against your Insured . . . on or about April 26, 2002, styled Ronald A. Bryce, et al. v. Arthur Andersen LLP and Andersen Worldwide.  Your acknowledgment of receipt of these materials and confirmation of coverage would be greatly appreciated . . . .

Your contact for the insured is:  Lynne M. Raimondo . . .  Defense counsel is:  John M. Touhy, Mayer Brown Rowe & Maw . . .

Please prove Federal's written consent to the insured's choice of defense counsel at your earliest convenience.

On behalf of our client, Andersen Worldwide, S.C., we reserve all rights under the policy, at law and in equity.  Should you have any questions regarding the enclosed or require any additional information, please do not hesitate to contact me.

(R. 135-1, Pl.'s SAMF, Ex. 3.)  Ms. Lieberman sent copies of this letter to several parties, including Ms. Raimondo and Mr. Touhy.[11]  (Id.)  As the letter plainly indicates, Marsh had forwarded the complaints on behalf of "its client" and further invited Federal to contact Ms. Lieberman should it "require any additional information."  (Id.)  Notably, the letter does not ask Federal to join in the defense of the *Buchholz/Bryce* matter, but rather asks only that Federal confirm coverage and consent to the "insured's choice of defense counsel."  (Id.)

On May 22, 2002, Gregory Smith, Federal's claims examiner responsible for handling the Andersen matter, responded to Ms. Lieberman's letter and acknowledged that he had received both the *Buchholz* and *Bryce* complaints.  (Id., Ex. 4.)  Mr. Smith further stated:

I will be in contact with you as soon as I have an opportunity to review the documents and the policy.  In the interim, Federal must reserve the right to raise all of the defenses available to it under the policy and the law.

In order to assure proper attention, all future correspondence should . . . be addressed to my attention.  If you have any questions or comments on this matter, please feel free to contact me [by phone or email].

---

[11]     The parties dispute whether Ms. Lieberman enclosed a cover letter to the *Bryce* complaint stating that the *Bryce* plaintiffs also had filed an arbitration demand.

(*Id.*)  Mr. Smith sent a copy of this letter to Ms. Raimondo.  (*Id.*)

On May 23, 2002, Mr. Smith noted in his claims file (the "Claims File") that he had

"[r]eviewed the [Andersen] matter on a preliminary basis."  (R. 132-1, Defs.' Stmt. of Material

Facts in Supp. of Cross Mot. for Summ. J. ("Defs.' CMSMF") at ¶ 14.)  Also in that Claims File

entry, Mr. Smith memorialized a phone conversation he had that same day with Ms. Lieberman:

> [I] [c]alled Andrea and asked several questions – she didn't know but promised to get
> answers.  She also requested that questions be addressed to her as she stated that there is
> a lot of confusion at the company right now.  My initial questions are contained in my
> letter to her.

(R. 129-1, Defs.' Resp. to Pl.'s SAMF, Ex. 29 at FED 03633.)  During his deposition, Mr. Smith

testified that upon making this preliminary review, he questioned whether the Policy covered the

*Buchholz/Bryce* complaint and requested that Claim Counsel (*i.e.* an in-house Federal attorney

who gives legal advice on anticipated insurance coverage disputes) also review the matter.  (R.

132-1, Defs.' CMSMF at ¶ 14.)

On May 29, 2002, in a letter to Ms. Lieberman, Mr. Smith, following up on his May 22

letter and subsequent phone conversation with Ms. Lieberman, reiterated his "preliminary

questions."  (R. 135-1, Pl.'s SAMF at ¶ 2.)  Specifically, Mr. Smith asked whether Mr. Touhy

represented all defendants and what rates he proposed to charge and whether the *Buchholz*

complaint had been amended and recaptioned as *Bryce*.  (R. 135-1, Pl.'s SAMF, Ex. 5.)  In

addition, Mr. Smith asked Ms. Lieberman to forward the Partnership Agreement and other

related documents.  (*Id.*)  In closing, Mr. Smith again stated that Federal reserved all of its rights

under the Policy.  (*Id.*)  Mr. Smith copied Ms. Raimondo on this letter, as well.  (*Id.*)

On June 19, 2002, Mr. Smith emailed Ms. Lieberman to follow-up on his May 29 letter.

(R. 137-1, Pl.'s SMF at ¶ 21.)  As of that date, Mr. Smith had not yet received "various

documentation from [Andersen]" and further asked Ms. Lieberman whether she had "[a]ny idea of when [he] might expect a response." (R. 129-1, Defs.' Resp. to Pl.'s SAMF, Ex. 29 at FED 03637.) That same day Ms. Lieberman responded, "[w]e did confirm that Lynne Raimondo received your letter, but haven't heard anything since then. I'll follow up with her and let you know what she says." (R. 137-1, Pl.'s SMF at ¶ 21; R. 129-1, Defs.' Resp. to Pl.'s SAMF, Ex. 29 at FED 03638.)

On July 2, 2002, Mr. Smith and Ms. Lieberman exchanged emails regarding the status of Federal's pending requests to Andersen. (R. 137-1, Pl.'s SMF at ¶ 22.) On July 12, 2002, Mr. Smith again emailed Ms. Lieberman to advise that Federal had not received the requested information from Andersen and that Federal was "unable to assess coverage, and [is] deferring same, until receipt of the requested information." (*Id.* at ¶ 23.) Ms. Lieberman responded: "I understand. I have been sending emails to the client and will continue to do so in an attempt to get the info[rmation] you need." (*Id.*)

On June 26, 2002, R. David Ades, an attorney for excess insurer AIG, contacted Federal about the Andersen matter. (R. 132-1, Defs.' CMSMF at ¶ 17; R. 129-1, Defs.' Resp. to Pl.'s SAMF, Ex. 29 at FED 03639.) Mr. Ades asked for a copy of the Policy and Federal's coverage opinion. (R. 129-1, Defs.' Resp. to Pl.'s SAMF, Ex. 29 at FED 03639.) In response, Mr. Smith stated that he "had not yet issued a cov[erage] opinion [because] there was an on-going investigation," but that he would do so "upon receipt of the information." (*Id.*, Ex. 29 at FED 03639.) On July 16, 2002, Mr. Ades again asked for Federal's coverage opinion. (*Id.*, Ex. 29 at FED 03644.) Mr. Smith replied, stating that he "had requested further info and would not be issuing a substantive cov[erage] opinion until [he] had reviewed that info[rmation]." (*Id.,* Ex. 29

at FED 03644.)  Mr. Smith's Claims File entry on this same date reflects that he received AIG's "standard excess letter" indicating that the *Buchholz/Bryce* complaint "may have been dismissed" and that he would "check" to confirm that such was the case.  (*Id.*, Ex. 29 at FED 03644.)  To that end, Mr. Smith left a voicemail message for Ms. Lieberman.  (*Id.*, Ex. 29 at FED 03645.)

On July 17, 2002, Mr. Smith reviewed the *Buchholz/Bryce* court file.  (*Id.*, Ex. 29 at FED 03646.)  Mr. Smith learned that the plaintiffs had moved for voluntary dismissal, that Andersen had filed an opposition thereto, and that the Court had dismissed the case without prejudice.  (*Id.*, Ex. 29 at FED 03646.)  He further noted that "[plaintiffs] can probably refile and don't know why [Andersen] opposed – perhaps [because Andersen] thought dismissal should have been [with] prejudice?  Will follow-up."  (*Id.*, Ex. 29 at FED 03646.)

On August 20, 2002, Ms. Raimondo wrote to Mr. Smith to address the "preliminary questions" that Mr. Smith raised in his May 29 letter.  (R. 135-1, Pl.'s SAMF at ¶ 3.)  Ms. Raimondo stated that Mayer Brown represented only Andersen, not Worldwide, and further provided Mayer Brown's hourly rate information.  (*Id.*)  Addressing Mr. Smith's request that Andersen confirm Federal's understanding of the relationship between the *Buchholz* and *Bryce* complaints, Ms. Raimondo responded:  "Your understanding is correct; however, you should note that the above-referenced [*Bryce*] federal lawsuit has been dismissed.  The plaintiffs indicated that they may pursue similar claims by way of arbitration pursuant to Article 29 of the Partnership Agreement."  (*Id.*)  Ms. Raimondo's letter enclosed a copy of the Partnership Agreement and the Andersen policy governing "retired partner payments and benefits."  (*Id.*)

On August 23, 2002, Mr. Smith noted that he had received documents from Andersen

and that a "quick review" indicated to him that the breach of fiduciary duty claim appears not to be a central issue." (R. 132-1, Defs.' CMSMF at ¶ 19.) Mr. Smith further noted that he had "not reviewed further at present because matter is dismissed and are waiting to see what Arb[itration] Demand actually says" and that "[f]or now" he was "closing [the] file." (*Id.*)

On September 25, 2002, Marsh's representative, Ms. Mary K. Meinert, forwarded to Mr. Smith another copy of the amended complaint in the *Bryce* action and advised him that counsel "for the plaintiffs tendered this amended complaint along with a purported arbitration demand." (R. 135-1, Pl.'s SAMF, Ex. 8.) Ms. Meinert also enclosed: (1) a complaint filed in an action captioned *Waters, et al. v. Arthur Andersen LLP*, pending in a California state court (filed July 1, 2002); (2) a demand for arbitration in a proceeding captioned *Samore v. Arthur Andersen LLP, et al.* (dated May 14, 2002); and (3) "numerous letters [received by Andersen] from retired partners making a variety of demands." (*Id.*) According to Ms. Meinert, "[m]any of these letters threaten arbitration or legal proceedings." (*Id.*) Much like Ms. Lieberman's initial letter to Federal, Ms. Meinert did not expressly request that Federal participate in Andersen's defense to the referenced actions:

> Your acknowledgment of receipt of these materials[12] and confirmation of coverage would be greatly appreciated . . . . Your contact for the insured is [Ms. Raimondo]. Defense counsel is: [Mr. Touhy]. Please confirm Federal's consent to the insured's selection of defense counsel at your earliest convenience. On behalf or our client, [Worldwide], we reserve all rights under the policy, at law and in equity. Should you have any questions regarding the enclosed or require any additional information, please do not hesitate to contact me.

(*Id.*, Ex. 8.) As with the *Buchholz/Bryce* complaint, the enclosed arbitration demands, the

---

[12]     According to his Claims File, on September 30, 2002, Mr. Smith "[c]alled agent at Marsh acknowledging receipt of submission." (R. 129-1, Defs.' Resp. to Pl.'s SAMF, Ex. 29 at FED 03652.)

lawsuit, and the election letters (the "Election Letters") sought payment from Andersen under the terms of the Partnership Agreement. (R. 137-1, Pl.'s SMF at ¶ 26.) Ms. Meinert sent copies of this letter to Ms. Raimondo, Mr. Touhy, and Ms. Lieberman, among others. (R. 135-1, Pl.'s SAMF, Ex. 8.)

On October 14, 2002, Mr. Smith acknowledged receipt of these materials. (*Id.* at ¶ 6.) He further indicated that he would review the materials provided in conjunction with the Policy and that, "[i]n the interim, Federal must reserve the right to raise all of the defenses available to it under the policy and the law." (*Id.*) Again, Mr. Smith copied Ms. Raimondo on this letter. (R. 135-1, Pl.'s SAMF, Ex. 9.)

On October 16, 2002, Mr. Smith spoke to Ms. Raimondo regarding the "*preliminary questions* . . . relating to the amounts sought, counsel, status, etc." that Mr. Smith originally posed in the letter he sent five months earlier. (R. 129-1, Defs.' Resp. to Pl.'s SAMF, Ex. 29 at FED 03657 (emphasis added).) In summarizing their conversation, Mr. Smith notes that Andersen "would likely want to settle this matter." (*Id.*, Ex. 29 at FED 03657.) Furthermore, he states:

> [Ms. Raimondo] also indicated that they are doing all of the right things to contest the various matters, including answering where appropriate and moving to dismiss where appropriate . . . . Re[garding] coverage I advised [Ms. Raimondo] that I was still reviewing, but expected to have an opinion to her within a few weeks. [Ms. Raimondo] said that if she could provide any further information to just call her . . . .

(*Id.*, Ex. 29 at FED 03657; R. 137-1, Pl.'s SMF at ¶ 29.) Noticeably absent from this conversation was any mention of whether Federal would participate in or undertake Andersen's defense. (R. 129-1, Defs.' Resp. to Pl.'s SAMF, Ex. 29 at FED 03657.)

## V.     Andersen's Settlement with the Retired Partners

On October 25, 2002, Andersen distributed a letter to the retired partners inviting them to attend a meeting during the first week of November "to present [Andersen's] proposal to resolve all Basic Retirement Benefit (BRB) and Early Retirement Benefit (ERB) claims." (R. 137-1, Pl.'s SMF at ¶ 35.) This letter also stated, "[w]e wrote to you in August that we would try to continue payments through November as part of this resolution – which we have done – and would try to develop a plan to pay future amounts albeit at a significant discount within the limitations imposed by the firm's current circumstances." (*Id.*)

On November 15, 2002, Ms. Raimondo informed Mr. Smith that Andersen had "engaged in dialogue" with and circulated a settlement proposal to the retired partners, which she attached to her letter. (*Id.* at ¶ 34.) The settlement agreement and corresponding release describe the nature of Andersen's proposal:

### BRB/ERB SETTLEMENT STATEMENT

* * *

This Agreement is made for the purpose of settling all claims of the undersigned retiree . . . relating to: (1) Basic Retirement Benefits under Article 19 of the AA Partnership Agreement or any related agreements ("BRB") and (2) Early Retirement Benefits under Article 12 of the AA Partnership Agreement or any related agreements ("ERB"). Upon the effectiveness of their Agreement . . . [Andersen] shall pay to the undersigned the BRB Settlement Payments and the ERB Settlement Payments . . . set forth on the attached Signature Page [which was to be executed individually by each settling retired partner] . . . .

Agreements and Acknowledgments . . .

Notwithstanding anything to the contrary contained herein, the undesigned, for him- or herself . . . acknowledges that (1) in no event shall the Administrator of [Andersen], any member of the Administrative Board of [Andersen] . . . [or] any present or former directors, officers . . . or similar persons of [Andersen] . . . (collectively, the "Covered Persons") have any personal liability with respect to [Andersen's] obligations to make Settlement payments hereunder, and (ii) no Covered Person shall be obligated to make, and no Covered Person in fact will make, any capital contribution or other payment of any kind to [Andersen] in order for [Andersen] to satisfy its obligations to make

Settlement Payments hereunder . . . .

* * *

## General Release and Covenant Not to Sue

* * *

The undersigned . . . does hereby release and forever discharge [Andersen and Worldwide] . . . from any and all actions . . . including . . . any Benefits Claims . . . that in any way arise from or out of, are based upon or relate to, the employment by, relationship to, association with or ownership of [Andersen] . . .

As used herein "Benefits Claims" means, collectively, any and all Claims that the undersigned now has . . . arising out of or in respect of (i) the Basic Retirement Benefit as provided in Article 19 or elsewhere in the AA Partnership Agreement or as provided in any other agreement or otherwise, (ii) the Early Retirement Benefit as provided in Article 12 and/or Article 18 or elsewhere in the AA Partnership Agreement or as provided in any other agreement or otherwise; including, without limitation, any Claim against any person or entity for damages based on the loss of Basic Retirement Benefits or Early Retirement Benefits . . . .

(R. 135-1, Pl.'s SAMF, Ex. 10 at FED 01335-36, 01338-39.)  The settlement agreement as drafted would obligate Andersen to make settlement payments to the retired partners, but Gorrell (a "Covered Person" and the "Administrator" to which the settlement agreement refers) would not "have any personal liability" thereunder.

In her letter, Ms. Raimondo further stated that "[t]o accomplish this settlement, we will need at least $75 million from our insurance carriers."  (*Id.*, Ex. 10 at FED 01332.)  In support of the request, Andersen advised the insurers that it had "received an overall evaluation of this controversy from [its] defense counsel" and that "[b]ased on that evaluation, [Andersen] concluded that the prudent and reasonable course of action is to attempt to settle . . . ."  (*Id.*, Ex. 10 at FED 01332.)  The settlement proposal indicated that the retired partners had until December 1, 2002 to accept or reject Andersen's proposal.  (R. 135-1, Pl.'s SAMF at ¶ 7.)

On November 25, 2002, Mr. Smith responded to Andersen's request for settlement funds,

stating that Federal "decline[d] at this time to contribute to the settlement." (*Id.* at ¶ 8.) In

addition, Mr. Smith asked Ms. Raimondo to provide Federal "with the overall evaluation of this

controversy from defense counsel" referenced in Ms. Raimondo's November 15, 2002 letter.

(*Id.*) In a series of letters dated between November 27, 2002 and December 3, 2002, Mr. Smith

informed Andersen that it "reserved its rights" and that it consented to Andersen's choice of

counsel, but that it denied coverage as to the claims raised in: (1) the (already dismissed) *Bryce*

action and related arbitration demand, (2) the "[l]etters from retired partners," (3) the *Waters*

action, and (4) the *Samore* arbitration demand. (*Id.*, Exs. 12-15.) In each letter, Mr. Smith

invited Ms. Raimondo to contact him if Andersen had any questions about Federal's coverage

opinions. (*Id.* at ¶ 9.)

On January 7, 2003, after receiving a positive response from the retired partners (the

proposed settlement required 90% of the retired partners to approve the settlement), Andersen

agreed to settle the partners' demands and claims for a total of $168 million. (R. 132-1, Defs.'

CMSMF at ¶ 30; R. 135-1, Pl.'s SAMF, Ex. 10 at 01333.) In exchange, the retired partners

released Andersen (and affiliated parties) from all exposures involving "any Claim against any

person or entity for damages based on the loss of Basic Retirement Benefits or Early Retirement

Benefits." (R. 132-1, Defs.' CMSMF at ¶ 30.)

On February 18, 2003, Federal filed this suit against the Insureds, but the Court, acting

*sua sponte*, dismissed the Complaint without prejudice for failing to properly plead federal

jurisdiction. (R. 128-1, Defs.' SMF at ¶ 12.) On March 18, 2003, Federal filed an amended

complaint. (*Id.* at ¶ 13.)

On March 28, 2003, Ms. Raimondo forwarded to Mr. Smith three new arbitration

demands (*Connolly v. Arthur Anderesn LLP*, *Moriarty v. Arthur Andersen LLP*, and *Small v. Arthur Andersen LLP and Larry Gorrell, Individually and as Administrator*), a class action complaint comprising a group of non-settling claimant retirees (*Viets v. Deloitte & Touche LLP, et al.*), and the two hundred plus Election Letters Ms. Raimondo had forwarded under her September 25 letter.  (R. 132-1, Defs.' CMSMF at ¶ 34; R. 135-1, Pl.'s SAMF at ¶ 10; *id.*, Ex. 16.)  Mr. Smith wrote to Ms. Raimondo, on May 6 and 7, 2003, informing her that Federal denied coverage as to the *Connolly*, *Moriarty*, and *Small* actions.[13]  (R. 135-1, Pl.'s SAMF, Exs. 18-22.)

On May 18, 2004, the Court granted Andersen's motion for partial judgment on the pleadings, finding that the *Buchholz/Bryce* complaints triggered Federal's duty to defend.  (R. 77-1, Order of May 18, 2004.)  Because the parties did not raise the issue, the Court's opinion did not address whether Federal breached its duty to defend.  (*Id.*)

## ANALYSIS

### I.    Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202

---

[13]    On September 8, 2003, Mr. Smith informed Ms. Raimondo that Federal denied coverage for the *Viets* action, as well.  (R. 132-1, Defs.' CMSMF at ¶ 35.)

(1986). In determining whether a genuine issue of material fact exists, the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Id.* at 255. The party seeking summary judgment must establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). To prevail, the responding party must then come forward with facts "sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial." *Id.* at 322. The existence of a factual dispute is not sufficient to defeat a summary judgment motion, instead the non-moving party must present definite, competent evidence to rebut the summary judgment motion. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

These "principles apply to cross-motions for summary judgment just as they would to a garden-variety summary judgment motion." *Steinberg v. Railroad Maint. and Indus. Health and Welfare Fund*, No. 03 C 4539, 2004 WL 1151619, *2 (N.D. Ill. Apr. 13, 2004) (citing *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002)). That is to say, "the court is to evaluate each motion on its merits, resolving factual uncertainties and drawing all reasonable inferences against the movant." *Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 991 (N.D. Ill. 2003). Because "each motion must be assessed independently [ ] denial of one does not necessitate the grant of the other." *Local 710 I.B.T. Pension Fund v. United Parcel Serv., Inc.,* No. 02 C 4420, 2004 WL 2403123, *3 (N.D. Ill. Oct. 26, 2004) (citation omitted). With these standards in mind, the Court turns to the merits of the parties' motions.

**I.     Andersen's Motion for Partial Summary Judgment**

In its motion for partial summary judgment, Andersen contends that Federal breached its duty to defend and that, as a result, Federal is estopped from contesting coverage in this case. Specifically, Andersen contends that Federal waited too long (six months) and until too late (after Andersen executed its settlement with the retired partners) to seek declaratory judgment. (R. 128-1, Defs.' Mem. in Supp. of Mot. for Partial Summ. J. at 10.)

**A.     Breaching the Duty to Defend**[14]

Whenever the duty to defend arises an insurer "may not simply refuse to defend the insured." *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 150, 237 Ill. Dec. 82, 94, 708 N.E.2d 1122, 1134 (1999).[15] "Rather, the insurer has two options:  (1) defend the suit under a reservation of rights or (2) seek a declaratory judgment that there is no coverage." *Ehlco*, 186 Ill. 2d at 150, 237 Ill. Dec. at 94-95, 708 N.E.2d at 1134-35.

As to the first alternative, "[t]he issuance of a reservation of rights letter to an insured is not the equivalent of *defending* the insured under a reservation of rights." *Commercial Underwriters v. Utica Mut. Ins. Co.*, No. 98 C 5484, 2002 WL 31357047, *9 (N.D. Ill. Oct. 18, 2002) (emphasis added).  Instead, when an insurer undertakes its duty to defend (even if accompanied by a reservation of rights) it must put forward an effective defense. *See Willis Corroon Corp. v. The Home Ins. Co.*, 203 F.3d 449, 452 (7th Cir. 2000).

_____

[14]     As noted above, in its Order of May 18, 2004, the Court determined that Federal owed Andersen a duty to defend based on the allegations of the *Buchholz/Bryce* action, but did not reach the issue of whether Federal breached that duty.

[15]     The parties agree that Illinois law governs the substantive issues in this diversity suit.

As to the second alternative, an insurer must file a declaratory judgment action "in a timely manner." *Aetna Cas. & Sur. Co. v. O'Rourke Bros., Inc.,* 333 Ill. App. 3d 871, 880, 267 Ill. Dec. 216, 224, 776 N.E.2d 588, 596 (3ᵈ Dist. 2002); *Ehlco*, 186 Ill. 2d at 150, 157, 237 Ill. Dec. at 94-95, 98, 708 N.E.2d at 1134-35, 1138. The timeliness of the insurer's declaratory judgment should be determined with respect to when each underlying claim arose. *O'Rourke Bros.,* 333 Ill. App. 3d at 880, 267 Ill. Dec. at 224, 776 N.E.2d at 596 (insurer breached its duty to defend where it waited 11 months to file declaratory judgment, but did not breach its duty to defend as to related suits filed just before the insurer filed its declaratory judgment). "The most important factor in determining whether an insurer has breached its duty to defend is not the raw chronological delay in an insurer's filing a declaratory judgment action, but whether the insurer waited until trial or settlement was imminent." *Id.* "Where an insurer waits to bring its declaratory judgment until after the underlying action has been resolved by judgment or settlement, the insurer's declaratory judgment is untimely as a matter of law." *Ehlco*, 186 Ill. 2d at 157, 237 Ill. Dec. at 98, 708 N.E.2d at 1138.

Yet "[i]f the insured indicates that it does not want the insurer's assistance, or is unresponsive or uncooperative, the insurer is relieved of its duty to defend." *Cincinnati*, 183 Ill. 2d at 326, 233 Ill. Dec. at 654, 701 N.E.2d at 504; *see also Employers Reinsurance Corp. v. E. Miller Ins. Agency, Inc.*, 332 Ill. App. 3d 326, 339-340, 265 Ill. Dec. 943, 954-54, 773 N.E.2d 707, 717-18 (1ˢᵗ Dist. 2002) (estoppel not appropriate where insured failed to respond to insurer's request for cooperation). "If, after being contacted, the insured indicates that it desires the insurer's assistance, then the insurer's duty to defend continues." *Cincinnati*, 183 Ill. 2d at 326, 233 Ill. Dec. at 654, 701 N.E.2d at 504. "[An] insurer does not become liable [for

indemnification] simply by inquiring of the insured whether it desires the insurer to defend."  *Id.*
at 327, 233 Ill. Dec. at 654, 701 N.E.2d at 504.  In addition, whether an insured has excused its
insurer from the duty to defend is a question of fact.  *See Commercial Underwriters*, 2002 WL
31357047 at *8.

    **B.    Estoppel**

    When an insurer fails to file a timely declaratory judgment action or defend under a
reservation of rights and "is later found to have wrongfully denied coverage, the insurer is
estopped from raising policy defenses to coverage" against its insured.  *Ehlco*, 186 Ill. 2d at 150-
51, 237 Ill. Dec. at 94-95, 708 N.E.2d at 1134-35; *see also RLI Ins. Co. v. Illinois Nat'l Ins. Co.*,
335 Ill. App. 3d 633, 644-45, 269 Ill. Dec. 524, 534, 781 N.E.2d 321, 331 (1ˢᵗ Dist. 2002)
(breaching the duty to defend estops an insurer from "raising policy exclusions or noncoverage
as a defense"); *Insurance Co. of Illinois v. Federal Kemper Ins. Co.*, 291 Ill. App. 3d 384, 387,
225 Ill. Dec. 444, 446, 683 N.E.2d 947, 949 (1ˢᵗ Dist. 1997) (same).  The estoppel doctrine
"[arises] out of the recognition that an insurer's duty to defend under a liability insurance policy
is so fundamental an obligation that a breach of that duty constitutes a repudiation of the
contract."  *Ehlco*, 186 Ill. 2d at 150-51, 237 Ill. Dec. at 94-95, 708 N.E.2d at 1134-35; *Schal
Bovis, Inc. v. Casualty Ins. Co.*, 315 Ill. App. 3d 353, 370, 247 Ill. Dec. 847, 860,732 N.E.2d
1179, 1192 (1ˢᵗ Dist. 2000) ("This principle is based upon the general principle of contract law
that a party who has breached the terms of its contract may not rely on the terms of the same
contract to avoid its obligations.").

    "[S]erious consequences [ ] result due to an insurer's unjustified refusal to defend a
covered claim . . ."  *Guillen v. Potomac Ins. Co. of Illinois*, 323 Ill. App. 3d 121, 132, 256 Ill.

Dec. 51, 61, 751 N.E.2d 104, 114 (1ˢᵗ Dist. 2001) (breaching duty to defend eliminates an insurer's right to approve a settlement). Indeed, "[o]nce the insurer breaches its duty to defend [ ] the estoppel doctrine has broad application and operates to bar the insurer from raising policy defenses to coverage, even those defenses that may have been successful had the insurer not breached its duty to defend." *Ehlco*, 186 Ill. 2d at 152, 237 Ill. Dec. at 95, 708 N.E.2d at 1135. Despite its broad effect, however, the "estoppel doctrine applies only where an insurer has breached its duty to defend" and, conversely, "[a]pplication of the estoppel doctrine is not appropriate if the insurer had no duty to defend, or if the insurer's duty to defend was not properly triggered." *American Nat. Fire Ins. Co. v. National Union Fire Ins. Co. of Pittsburgh, PA,* 343 Ill. App. 3d 93, 101, 277 Ill. Dec.767, 774, 796 N.E.2d 1133, 1140-1140 (1ˢᵗ Dist. 2003) (citation omitted); *see also E. Miller Ins. Agency*, 332 Ill. App. 3d at 340, 265 Ill. Dec. at 954, 773 N.E.2d at 718 ("if the insurer had no duty to defend or its duty to defend was not properly triggered, estoppel cannot be applied against the insurer. Such is the case where the insurer was given no opportunity to defend or participate in the underlying suit . . .").

> **C.     An Issue of Material Fact Exists as to Whether Federal Breached Its Duty to Defend, and, Hence, Whether the Estoppel Doctrine Applies Here**

According to these controlling principles, if Federal breached its duty to defend, then it is estopped from raising policy defenses against Andersen in this case. These principles also establish, however, that if Andersen did not want Federal to assist in its defense or if Andersen was "unresponsive or uncooperative," then Federal was relieved of its duty to defend. *Cincinnati Cos. v. West American Ins. Co.*, 183 Ill. 2d 317, 327, 233 Ill. Dec. 649, 654, 701 N.E.2d 499, 504 (1998); *E. Miller Ins. Agency*, 332 Ill. App. 3d at 339-340, 265 Ill. Dec. at 954-54, 773 N.E.2d at 717-18; *see also Commercial Underwriters*, 2002 WL 31357047 at *8.

Construing the facts in a light most favorable to Federal, as the Court must, a reasonable jury could conclude that Andersen had, in effect, relieved Federal of its duty to defend.

First, in the initial letter to Federal, Ms. Lieberman, acting on behalf of Andersen, did not ask Federal to defend Andersen. Rather, she asked only that Federal consent to Andersen's (already-retained) choice of independent defense counsel. (R. 135-1, Pl.'s SAMF, Ex. 3 ("Defense counsel is: John M. Touhy . . . Please prove Federal's written consent to the insured's choice of defense counsel at your earliest convenience."); *id.*, Ex. 8 (letter to Federal enclosing additional claims against Andersen and asking only that Federal consent to Andersen's choice of counsel); *see also* R. 129-1, Defs.' Resp. to Pl.'s SAMF, Ex. 29 at FED 03657 (summary of the initial conversation between Federal and Andersen showing that the parties did not discuss whether Federal would participate in or undertake Andersen's defense).) Second, Andersen did not respond to Mr. Smith's preliminary inquiries for three months, thus leaving Federal's claims examiner without the items he needed to conduct a duty to defend or coverage analysis, including the Partnership Agreement under which the retired partners asserted their right to retirement benefits. Third, by the time Andersen responded to Federal's initial inquiries (in August 2002) the court had dismissed the *Bryce* action and, hence, Federal arguably had nothing to defend Andersen against.[16]

Finally, Defendants rely heavily on the fact that, despite having contact information for both Ms. Raimondo and Mr. Touhy, Federal did not "pick up the phone" to inquire as to the progress of the underlying proceedings. (R. 132-1, Defs.' Mem. in Supp. of Cross Mot. for

---

[16] Federal did not receive notice of active claims until Ms. Raimondo's September 25 letter, which enclosed, among other items, an arbitration demand that had been filed against Andersen in May 2002.

Summ. J. at 9-14.)  A reasonable jury could conclude, however, that Federal acted appropriately, only to be met with an unresponsive insured.  Indeed, Ms. Lieberman specifically requested that Mr. Smith communicate with her, and not Andersen, because of Andersen's then-current state of "confusion."  (R. 129-1, Defs.' Resp. to Pl.'s SAMF, Ex. 29 at FED 03633.)  Mr. Smith obliged, submitting several unanswered requests to Ms. Lieberman (many of which were copied to Ms. Raimondo)[17] for information essential to formulating a coverage opinion.  (*Id.*; R. 135-1, Pl.'s SAMF at ¶ 2; R. 137-1, Pl.'s SMF at ¶ 21-23.)  Moreover, Ms. Lieberman further informed Mr. Smith that she "[had] been sending emails to the client and will continue to do so in an attempt to get the info[rmation] [he] requested" (*Id.*; R. 137-1, Pl.'s SMF at ¶ 21) – a statement implicitly suggesting that, even if Mr. Smith contacted Andersen directly, he would fare no better in getting a response to his preliminary requests.

        Thus, when viewing the facts in Federal's favor, an issue of material fact exists as to

---

[17]        The record reflects that, after receiving notice of the *Buchholz* and *Bryce* complaints on May 16, 2002, Mr. Smith made at least five requests for information responsive to his preliminary inquiries, ultimately receiving Andersen's response (which indicated that the *Buchholz/Bryce* action had been dismissed) on August 20, 2002.  (*See* R. 129-1, Defs.' Resp. to Pl.'s SAMF, Ex. 29 at FED 03633 (May 23, 2002 telephone call to Ms. Lieberman posing several "initial questions" to which Ms. Lieberman had no response); R. 135-1, Pl.'s SAMF at ¶ 2 (May 29, 2002 letter to Ms. Lieberman, with a copy to Ms. Raimondo, reiterating Mr. Smith's "preliminary questions"); R. 137-1, Pl.'s SMF at ¶ 21 (June 19, 2002 email to Ms. Lieberman requesting a response to Mr. Smith's preliminary requests); R. 129-1, Defs.' Resp. to Pl.'s SAMF, Ex. 29 at FED 03638 (June 19, 2002 email from Ms. Lieberman indicating that Ms. Raimondo had received Mr. Smith's May 29 letter, but that Ms. Raimondo had not yet responded to Mr. Smith's preliminary questions); *id.* at ¶ 22 (July 2, 2002 email exchange regarding the status of Federal's pending requests to Andersen); *id.* at ¶ 23 (July 12, 2002, email exchange regarding the status of Federal's pending requests including a response from Ms. Lieberman stating that she had "been sending emails to the client and will continue to do so in an attempt to get the [requested] info[rmation]"); R. 135-1, Pl.'s SAMF at ¶ 3 (letter from Ms. Raimondo responding to Mr. Smith's preliminary inquiries and noting that the *Buchholz/Bryce* action had been dismissed).)

whether Andersen was sufficiently unresponsive and uncooperative to relieve Federal of its duty

to defend. *Cincinnati*, 183 Ill. 2d at 327, 233 Ill. Dec. at 654, 701 N.E.2d at 504; *E. Miller Ins.*

*Agency, Inc.*, 332 Ill. App. 3d at 339-340, 265 Ill. Dec. at 954-54, 773 N.E.2d at 717-18.

Accordingly, the Court denies the Defendants' motion for partial summary judgment.[18]

## III.     Federal's Motion for Summary Judgment

In its motion for summary judgment, Federal asserts that:  (1) the Court should dismiss

the Defendants' counterclaims because the estoppel doctrine does not apply, (2) the Policy does

not cover Andersen's loss, and (3) Defendants cannot recover statutory penalties under Section

155 of the Illinois Insurance Code.  Although Federal correctly concludes that the Policy does

not cover Andersen's loss, the Court cannot grant summary judgment because an issue of

material fact exists as to whether Federal is estopped from raising policy defenses.

### A.     Estoppel

Like Defendants' motion on the same claim, an issue of material fact exists as to whether

Federal breached its duty to defend.  Construing the facts in a light most favorable to

Defendants, by May 16, 2002, Federal had received notice of the *Buchholz/Bryce* class action

(purporting to represent a class of all retired partners) and also the direct contact information for

both Ms. Raimondo, of Andersen, and Mr. Touhy, Andersen's counsel.  (R. 135-1, Pl.'s SAMF,

Ex. 3.)  In addition, by May 23, 2002, Federal had reviewed the complaints and recognized a

potential coverage dispute.  (R. 132-1, Defs.' CMSMF at ¶ 14; R. 129-1, Defs.' Resp. to Pl.'s

---

[18]     Andersen's Cross-Motion pursues summary judgment as to Andersen's second
and third counterclaims, which seek compensatory and statutory damages based on Federal's
alleged breach of its duty to defend.  Because both of these claims depend on a finding that
Federal in fact breached its duty – a question that remains unresolved at this juncture – the Court
denies Andersen's Cross-Motion, as well.

SAMF, Ex. 29 at FED 03633.)  Yet despite sufficient notice and despite recognizing a potential

coverage dispute, Federal failed to conduct a duty to defend analysis until late November 2002

and failed to file a declaratory judgment action until after Andersen had settled the underlying

proceedings.  (R. 135-1, Pl.'s SAMF at ¶ 9.)  Moreover, Federal did not even contact Andersen

or Andersen's defense counsel for five months, choosing instead to communicate exclusively

with a Marsh representative who proved unable to respond to Federal's inquiries.  (R. 129-1,

Defs.' Resp. to Pl.'s SAMF, Ex. 29 at FED 03657, 03633; R. 135-1, Pl.'s SAMF at ¶ 2; R. 137-

1, Pl.'s SMF at ¶ 21-23.)  These facts, if credited by the jury, could establish that Federal

breached its duty to defend, thus giving rise to estoppel.  *Ehlco*, 186 Ill. 2d at 150, 237 Ill. Dec.

at 94-95, 708 N.E.2d at 1134-35.[19]  Accordingly, the Court denies Federal's motion for summary

_____

[19]    Even though a material fact issue exists as to whether the estoppel doctrine
applies here, Federal presents an additional, independent argument that, if sustained, would
warrant summary judgment in its own right.  Federal contends that the Court should dismiss
Andersen's counterclaims because the underlying loss is uninsurable as a matter of public policy.
(R. 137-1, Pl.'s Mem. in Supp. of Mot. for Summ. J. at 22.)  Federal's cited authorities, however,
do not establish that insuring a loss such as that at issue here would violate public policy.  *See,
e.g., Mortenson v. National Union Fire Ins. Co.*, 249 F.3d 667, 672 (7th Cir. 2001) (statutory tax
penalty for willful nonpayment of payroll taxes comes close to the rule that forbids insuring
against criminal fines and thus it is *perhaps* uninsurable as a matter of public policy); *Level 3
Comms., Inc. v. Federal Ins. Co.*, 272 F.3d 908, 910-12 (7th Cir. 2001) (holding, without
discussing public policy, that return of ill-gotten gains from securities fraud scheme not a "loss"
as defined in the controlling insurance policy); *Local 705 Int'l Bhd. of Teamsters Health &
Welfare Fund v. Five Star Managers, LLC*, 216 Ill. App. 3d 391, 396, 249 Ill. Dec. 75, 78-79,
735 N.E.2d 679, 682-83 (1st Dist. 2000) (return of "monies which [the insured] had no right to
possess in the first place" not a "loss" as defined in controlling insurance policy); *see also May
Dep't Stores v. Federal Ins. Co.*, 305 F.3d 597 (7th Cir. 2002) (noting that insuring a pension plan
against an underpayment of benefits would entail an "acute moral hazzard problem," but not
discussing whether such insurance would violate public policy).  While statutory penalties and
wrongfully appropriated property are perhaps not insurable, neither of these "losses" is at issue
here.  Rather, the retired partners, in line with Andersen's established practice, merely sought to
accelerate their retirement benefits, which Andersen rightfully possessed and maintained on
behalf of the partners under ERISA.  As a result, Federal is not entitled to summary judgment on
this basis.

judgment on the Defendants' estoppel claim.

**B. Coverage**

Federal also moves for summary judgment contending that, estoppel aside, various provisions in the Policy preclude coverage of Andersen's settlement. Specifically, Federal contends that: (1) Andersen's settlement is not a Loss because it did not result from a "Claim" against the Insureds "for a Wrongful Act;" (2) Andersen failed to abide by the Policy's "Consent to Settlement" provision; and (3) the "benefits due" exclusion precludes coverage. (R. 137-1; Pl.'s Mem. in Supp. of Mot. for Summ. J. at 23-27.) Even though a material issue of fact precludes summary judgment for either party on the Defendants' estoppel claim – a claim that, if successful, would bar Federal from asserting policy defenses[20] – the Court will determine whether the Policy covers the settlement because "[t]he construction of an insurance policy . . . is a question of law to be determined by a court." *See The PrivateBank and Trust Co. v. Progressive Cas. Ins. Co.,* No. 03 C 6031, 2004 WL 1144048, *3 (N.D. Ill. May 18, 2004) (quoting *Alpine State Bank v. Ohio Cas. Ins. Co.*, 941 F.2d 554, 559 (7th Cir. 1991)).

"In construing an insurance policy, the primary function of the court is to ascertain and enforce the intentions of the parties as expressed in the insurance contract." *Id.* (citing *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill. 2d 90, 108, 180 Ill. Dec. 691, 607 N.E.2d 1204, 1212 (1992)). To that end, "the court must construe the policy as a whole and take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 527 (7th Cir.

---

[20] Accordingly, for purposes of this discussion, the Court will assume *arguendo* that Federal did not breach its duty to defend and that it is not estopped from asserting policy defenses.

2005) (citing *Emerson Elec. Co. v. Aetna Sur. & Cas. Co.*, 352 Ill. App. 3d 399, 287 Ill. Dec. 280, 815 N.E.2d 924, 937 (1st Dist. 2004)). In addition, "an insurance policy that contains no ambiguity is to be construed according to the plain and ordinary meaning of its terms, just as would any other contract." *The PrivateBank*, 2004 WL 1144048 at *3 (citing *National Fid. Life Ins. Co. v. Karaganis*, 811 F.2d 357, 361 (7th Cir. 1987)); *see also Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 479, 230 Ill. Dec. 229, 693 N.E.2d 358, 368 (1998) ("The terms of an agreement, if not ambiguous, should be generally enforced as they appear, and those terms will control the rights of the parties."). "If the language of the policy is susceptible to more than one meaning, it is considered ambiguous and will be construed strictly against the insurer who drafted the policy and in favor of the insured." *Premcor USA*, 400 F.3d at 527 (citation omitted). "Nonetheless, courts should not search for an ambiguity where none exists." *The PrivateBank*, 2004 WL 1144048 at *3 (citing *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391, 189 Ill. Dec. 756, 620 N.E.2d 1073, 1077-1078 (1993)).

When an insured seeks indemnification for a settled claim without an actual finding of liability, the insured is required to show only that "it settled an otherwise covered loss in reasonable anticipation of personal liability." *Commonwealth Edison Co. v. National Union Fire Ins. Co. of Pittsburgh, PA.*, 323 Ill. App. 3d 970, 978, 256 Ill. Dec. 675, 681, 752 N.E.2d 555, 561 (1st Dist. 2001) (further noting that the "reasonable anticipation" "rule avoid[s] placing insureds in the position of having to refute liability in the underlying action until settlement and then instantly turn around and prove their own liability in the insurance action") (internal quotation and citation omitted). Stated differently, the insured must show that it settled the underlying lawsuits in reasonable anticipation of a claim covered under its insurance policy. *See*

*Flodine v. State Farm Ins. Co.,* No. 99 C 7466, 2003 WL 1394977, *7 (N.D. Ill. Mar. 9, 2003)*;*

*TIG Ins. Co. v. Joe Rizza Lincoln-Mercury, Inc.,* No. 00 C 5182, 2002 WL 406982, *11 (N.D. Ill.

Mar. 14, 2002).  With these principles in mind, the Court will address whether the Policy covers

Andersen's settlement with the retired partners.

### 1.    The Definition of Loss

Andersen seeks coverage for the claims it settled with its retired partners.  Federal

contends, however, that Andersen's settlement is not an insured Loss because the retired

partners' Election Letters did not allege that the Insureds committed a Wrongful Act.  (R. 137-1,

Pl.'s Mem. in Supp. of Summ. J. at 23.)  Federal further argues that the Policy does not cover the

six hundred plus settlements that Andersen executed with retired partners who had not

previously submitted any form of written demand.

The Court agrees, to an extent.  The Policy defines a Loss as a "legal[ ] obligat[ion] to

pay" for a Claim "made against [the Insureds] for Wrongful Acts," *i.e.* "any breach of

responsibilities, obligations or duties imposed upon fiduciaries of the Sponsored Plan by

[ERISA]" and "any negligent act . . . in the Administration of any Sponsored Plan . . ."  (Pl.'s

Third Am. Compl., Ex. A at ¶ 15.)  The Election Letters, however, do not allege any such

breach, but rather ask only that Andersen accelerate benefits in line with its established

practice.[21]  (*See, e.g.*, R. 135-1, Pl.'s SAMF, Ex. 8 at FED 01041; *see generally* R. 26-1, Defs.'

Ans. to Pl.'s Second Am. Compl., Ex. A.)  In addition, the Policy covers only those Claims

arising from a *written* demand, thus Federal would not have to indemnify Andersen for its

---

[21]    For the same reason, the Elections Letters do not demand "monetary damages"
and, thus, do not constitute Claims as defined by the Policy.  (R. 135-1, Pl.'s SAMF, Ex. 8 at
FED 01041.)

settlement with those partners who did not submit demands in writing.  (Pl.'s Third Am. Compl., Ex. A at ¶ 15.)

Nonetheless, contrary to Federal's suggestion, the Policy may cover Andersen's settlement.  Federal ignores the fact that the settlement likely included amounts aimed at resolving the *Buchholz/Bryce* class action complaint (purporting to represent all of Andersen's retired partners), the *Waters* complaint, and the *Samore* arbitration demand.  Each of these proceedings, unlike the Election Letters, alleged that the Insureds committed "Wrongful Acts" by breaching their fiduciary duties.[22]  The record, however, does not indicate to what extent Andersen's settlement pertains to the claims raised in the *Buchholz/Bryce*, *Waters*, and *Samore* proceedings as opposed to the Election Letters.  Thus, the Court cannot conclude at this juncture whether, or to what extent, the settlement constitutes a Loss.  For the reasons below, however, the Court finds that the Policy would not cover the settlement in any event.

## 2.    The "Consent To Settlement" Provision

Federal contends that the Policy precludes coverage for the additional reason that Andersen failed to comply with the "Consent to Settlement" provision.  The Court agrees.  The "Consent to Settlement" provision unambiguously requires Andersen to obtain Federal's consent before settling a claim for more than $250,000:

---

[22]    Federal contends also that Andersen cannot now claim that the retired partners were Andersen employees (thus falling within the Policy's definition of Sponsored Plan) when, in the underlying litigation, Andersen asserted that ERISA did not apply because the retired partners were not employees.  Federal, however, does not cite authority for this proposition and, indeed, it appears that Illinois law is to the contrary.  *See Commonwealth Edison*, 323 Ill. App. 3d at 980-81, 256 Ill. Dec. at 684, 752 N.E.2d at 564 (citing *U.S. Gypsum Co.*, 268 Ill. App.3d 598, 205 Ill. Dec. 619, 643 N.E.2d 1226 (1st Dist. 1994)) ("insureds [should not be put] in the position of having to refute liability in the underlying action until settlement and then instantly turn around and prove their own liability in the insurance action").

> The Insureds agree not to settle any Claim or incur any Defense Costs in an amount greater than $250,000, assume any contractual obligation or admit any liability with respect to any Claim without the [Federal's] written consent, which shall not be unreasonably withheld. [Federal] shall not be liable for any settlement and/or Defense Costs above $250,000, assumed obligation or admission to which it has not consented.

(Pl.'s Third Am. Compl., Ex. A at ¶ 3.) Andersen concedes that it failed to obtain Federal's consent before settling for $168 million, but argues that it nonetheless complied with this provision by giving Federal *the opportunity to consent*. (R. 132-1, Defs.' Mem. in Supp. of Cross Mot. for Summ. J. at 26-27.) Andersen's cited authority, however, does not support such a conclusion. (*Id.*) Moreover, Andersen fails to explain how giving Federal the opportunity to consent squares with the Policy's unambiguous requirement that Andersen *actually obtain* written consent. (*Id.*) Thus, assuming that Federal reasonably withheld its consent to Andersen's settlement, the "Consent to Settlement" clause would preclude coverage.

### 3. The "Benefits Due" Exclusion

In its last policy-based attack, Federal asserts that the Policy's "benefits due" exclusion eliminates coverage. That clause excludes losses "constitut[ing] benefits due or to become due under the terms of a Benefit Program," but further provides that the Policy will cover "benefits due" "to the extent that, (i) the Insured is a natural person and the benefits are payable by such Insured as a personal obligation, and (ii) recovery for the benefits is based upon a covered Wrongful Act." (Pl.'s Third Am. Compl., Ex. A at ¶ 6(d).) In response, Andersen alleges that the settlement is not a payout for "benefits due" to the retired partners, but rather reflects *damages* based on the *loss* of benefits caused by the Insureds' breach of fiduciary duty.[23]

---

[23]     On this score, Andersen notes that: (1) during the underlying proceedings, the retired partners tried to avoid the terms of the Partnership Agreement because it allowed Andersen to terminate benefits thereunder at any time; (2) certain arbitrators found that

Andersen further contends that because the *Buchholz/Bryce* plaintiffs alleged that both Andersen and Gorrell (in his individual capacity) were liable, the exception to the "benefits due" provision applies, thereby giving rise to coverage.

The Court finds Defendants' first contention unpersuasive. Here, the retired partners alleged that the Partnership Agreement entitled them to retirement benefits, that ERISA governed those benefits,[24] and that they lost their benefits because Andersen breached its fiduciary duties. Indeed, the settlement agreement itself recognizes that the underlying claims centered upon the benefits allegedly due to the retired partners:

> [The Settlement] Agreement is made for the purpose of settling all claims of the undersigned retiree . . . relating to: (1) Basic Retirement Benefits under . . . [the] Partnership Agreement . . . and (2) Early Retirement Benefits under . . . [the] Partnership Agreement . . . [Andersen] shall pay to the undersigned the BRB Settlement Payments and the ERB Settlement Payments . . .

(R. 135-1, Pl.'s SAMF, Ex. 10 at FED 01335.) Simply put, Andersen settled claims for benefits. Andersen cannot now create coverage by characterizing its loss otherwise. *See May Dep't Stores*, 305 F.3d at 602 (construing the same "benefits due" exclusion and finding loss excluded because "[w]hat was being sought were benefits, and characterizing an award of benefits as a from of equitable relief would not bring it outside the exclusion in the policy").[25]

---

Andersen did not "owe" benefits under the Partnership Agreement; (3) the retired partners settled at a steep discount; and (4) the settlement payments are taxed as income, not benefits.

[24] If ERISA did not govern the retired partners claims, then the Policy's Fiduciary Liability Coverage would not cover the settlement because the Wrongful Acts alleged would not relate to a Sponsored Plan as is required to give rise to an insurable Loss.

[25] The *May Dep't Stores* court further commented on insuring companies for underpayment of ERISA benefits:

> It would be passing strange for an insurance company to insure a pension plan (and its sponsor) against an underpayment of benefits, not only because of the enormous and

Furthermore, the record does not support Andersen's second argument.  Under the

settlement agreement, Gorrell is not legally obligated to pay any settlement amounts.  Andersen,

and Andersen alone, is on the hook:

> [Andersen] shall pay to the undersigned the BRB Settlement Payments and the ERB
> Settlement Payments . . .
>
> [The settling retired partner] acknowledges that (i) in no event shall the Administrator of
> [Andersen], . . . [or] any present or former director . . . or similar persons of [Andersen]
> . . . have any personal liability with respect to [Andersen's] obligations to make
> Settlement payments . . .

(R. 135-1, Pl.'s SAMF, Ex. 10 at FED 01335 (Andersen's proposed settlement agreement).)

Because the settlement agreement specifically excepts Gorrell from incurring a "personal

obligation" the exception to the "benefits due" exclusion does not apply and the Policy does not

cover Andersen's loss.

## C.     Section 155 of the Illinois Insurance Code

Federal also moves for summary judgment on Defendants' claim for statutory damages

under Section 155 of the Illinois Insurance Code.  That Section provides, in relevant part:

> In any action by or against a company wherein there is in issue the liability of a company
> on a policy or policies of insurance or the amount of the loss payable thereunder, or for
> an unreasonable delay in settling a claim, and it appears to the court that such action or

---

> unpredictable liability to which a claim for benefits on behalf of participants in or
> beneficiaries of a pension plan of a major employer could give rise, but also because of
> the acute moral hazard problem that such coverage would create. ("Moral hazard" is the
> term used to denote the incentive that insurance can give an insured to increase the risky
> behavior covered by the insurance.) Such insurance would give the plan and its sponsor
> an incentive to adopt aggressive (just short of willful) interpretations of ERISA designed
> to minimize the benefits due, safe in the belief that if, as would be likely, the
> interpretations were rejected by the courts, the insurance company would pick up the tab.
> Heads I win, tails you lose.

305 F.3d at 601.

delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs . . .

215 ILCS 5/155. "Section 155 applies only against insurers who act vexatiously and unreasonably in delaying or denying a claim, and [ ] wrongful denial of coverage by itself is not enough." *Knoll Pharm. Co. v. Automobile Ins. Co. of Hartford*, 210 F. Supp. 2d 1017, 1028 (N.D. Ill. 2002) (citing among other authorities *Citizens First Nat'l Bank v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000)). "Section 155 of the Code is the legislature's remedy to an insured . . . 'who encounters unnecessary difficulties when an insurer withholds policy benefits.'" *Peerless Enter., Inc. v. Kruse*, 317 Ill. App. 3d 133,144, 250 Ill. Dec. 519, 530, 738 N.E.2d 988, 999 (2[d] Dist. 2000) (quoting *Richardson v. Illinois Power Co.*, 217 Ill. App. 3d 708, 711, 160 Ill. Dec. 498, 577 N.E.2d 823 (5th Dist. 1991)).

"In determining whether an insurer's conduct is vexatious and unreasonable, courts must look at the totality of the circumstances . . . including the insurer's attitude . . ." *Knoll*, 210 F. Supp. 2d at 1028-29 (citation omitted); *Marcheschi v. Illinois Farmers Ins. Co.*, 298 Ill. App. 3d 306, 313, 232 Ill. Dec. 592, 597, 698 N.E.2d 683, 688 (1st Dist. 1998) (same). "Illinois courts agree that, in determining whether an insurer has acted vexatiously or unreasonably in processing a claim, no single factor is dispositive." *Yoon v. Investors Life Ins. Co. of N. Am.*, No. 88 C 6768, 1990 WL 16478, *8 (N.D. Ill. Jan. 31, 1990) (citing authorities); *see also Green v. International Ins. Co.*, 238 Ill. App. 3d 929, 935, 179 Ill. Dec. 111, 115, 605 N.E.2d 1125, 1129 (2[d] Dist. 1992) ("Neither the length of time, the amount of money involved, nor any other single factor is dispositive; rather it is the attitude of the [insurer] which must be examined") (internal quotation omitted). Because no particular factor determines whether an insurer has acted vexatiously or unreasonably, "circumstances may exist where [a two and one-half month]

delay can be vexatious and unreasonable." *Maduff v. Life Ins. Co. of Virginia*, 657 F. Supp. 437, 439 (N.D. Ill. 1987). Accordingly, "[w]hether an insurer's conduct is vexatious and unreasonable is a factual issue best left to the discretion of the finder of fact." *Knoll*, 210 F. Supp. 2d at 1028 -29 (citation omitted).

In addition, "[o]ne important benefit of a liability policy is the defense of liability claims that have been filed in court." *Richardson*, 217 Ill. App. 3d at 711, 160 Ill. Dec. at 501, 577 N.E.2d at 826. Indeed, "[i]t would defeat the purpose of the statute to allow an insurer to escape any penalty when it fails to provide one of the most important benefits of a liability policy – a defense." *Bedoya v. Illinois Founders Ins. Co.,* 293 Ill. App. 3d 668, 679, 228 Ill. Dec. 59, 66, 688 N.E.2d 757, 764 (1ˢᵗ Dist. 1997) (quoting *Richardson,* 217 Ill. App. 3d at 711, 160 Ill. Dec. at 501, 577 N.E.2d at 826); *Ehlco,* 186 Ill. 2d at 159, 237 Ill. Dec. at 99, 708 N.E.2d at 1139 ("[a]n award under section 155 is proper where an insurer has acted vexatiously and unreasonably in refusing to defend its insured").

"The law, however, is well-settled by the Illinois Supreme Court that where a *bona fide* dispute concerning coverage exists, the insurer's actions in denying or delaying coverage are not vexatious and unreasonable and that sanctions and costs are therefore not appropriate." *Knoll*, 210 F. Supp. 2d at 1028-29 (citation omitted). "The definition of *bona fide* is '[r]eal, genuine, and not feigned.'" *Id.* (quoting *McGee v. State Farm Fire & Cas. Co.*, 315 Ill. App. 3d 673, 248 Ill. Dec. 436, 734 N.E.2d 144, 153 (2000)). "An insurer may in good faith entertain a difference of opinion regarding policy coverage, and no penalty should be assigned unless this conduct was without reasonable cause." *Id.* (citation omitted). "Additionally, a difference of opinion is not rendered unreasonable simply because judgment was later adverse to the insurer." *Id.* (citation

omitted).  But when an insurer fails to raise its *bona fide* disputes in a declaratory judgment action or defend its insured under a reservation of rights, an insurer may be found liable under Section 155.  *See Korte Const. Co. v. Am. States Ins.,* 322 Ill. App. 3d 451, 460, 750 N.E.2d 764, 772, 255 Ill. Dec.847, 855 (5th Dist. 2001); *see also Ehlco,* 186 Ill. 2d at 159, 237 Ill. Dec. at 99, 708 N.E.2d at 1139.

Issues of material fact preclude summary judgment on the Defendants' Section 155 claim.  Federal contends that the "significant briefing generated in this action over the meaning of the Policy" "irrefutably proves" that a *bona fide* dispute exists such as to warrant dismissal. (R. 137-1, Pl.'s Mem. in Supp. of Summ. J. at 28.)  Construing the facts in a light most favorable to Andersen, however, Section 155 could apply here.  By May 2002, Federal had everything it needed (the *Buchholz/Bryce* complaint and the Policy) to conduct a duty to defend analysis and to confirm coverage, but yet it did neither until late November 2002.  Because Federal waited six months to issue its coverage opinion – during which time Andersen had to defend itself against the retired partners' claims – a reasonable jury could conclude that until that time the parties did not have a dispute at all, and that Federal's conduct was vexatious and unreasonable.  *See, e.g., Korte Const.,* 322 Ill. App. 3d at 460, 255 Ill. Dec. at 855, 750 N.E.2d at 772.  Moreover, looking to the "totality of the circumstances," Federal's delay may be even more egregious given that Federal did not directly communicate with Andersen or its counsel even though Andersen at the time was at "the center of Hurricane Enron."  *Roquet v. Arthur Andersen LLP,* 398 F.3d 585, 587 (7th Cir. 2005).  Accordingly, the Court denies Federal's motion for summary judgment as to Defendants' claim under Section 155 of the Illinois Insurance Code.

## CONCLUSION

For the above stated reasons, the Court denies:  (1) Defendants' motion for partial summary judgment as to counterclaim I; (2) Federal's motion for summary judgment on counterclaims I-III; (2) and Defendants' cross-motion for summary judgment as to counterclaim II and III.

Dated:  August 2, 2005                                ENTERED


_____
AMY J. ST. EVE
United States District Judge